*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

CARL STEPHEN SANKER, also known as CARL STEVEN SANKER,

        Plaintiff-Appellant,

v

KEN GARFF AUTOMOTIVE, LLC, formerly known as DEALERS' CHOICE AUTOMOTIVE ADVISORS, GL TELEGRAPH, LLC, formerly known as TELEGRAPH CHRYSLER DODGE JEEP RAM, and TELEGRAPH CHRYSLER DODGE JEEP RAM OF TAYLOR MICHIGAN,

        Defendants-Appellees.

UNPUBLISHED
August 24, 2023

No. 361295
Washtenaw Circuit Court
LC No. 21-000011-CD

Before: O'BRIEN, P.J., and CAVANAGH and MARKEY, JJ.

PER CURIAM.

Plaintiff, Carl Sanker, appeals by right the trial court's order granting summary disposition under MCR 2.116(C)(10) in favor of defendants, Ken Garff Automotive, LLC, GL Telegraph, LLC, and Telegraph Chrysler Dodge Jeep Ram of Taylor[1] (collectively "the dealership"). Although plaintiff alleged numerous causes of action, ultimately the only claim remaining at issue is plaintiff's contention that the dealership violated the Whistleblowers' Protection Act (WPA), MCL 15.361 *et seq.*, when it terminated plaintiff's employment. We note, narrowing the claim even further, that the issue presented on appeal is whether plaintiff presented evidence sufficient to demonstrate a genuine issue of material fact with respect to whether there was a causal connection between plaintiff's engagement in protected activity and the dealership's act of discharging him. The trial court concluded that there was no evidence that plaintiff had expressed to anyone that he was about to report suspected illegal activity before he was fired. We affirm.

---

[1] GL Telegraph, LLC, owns and operates an automobile dealership known as Telegraph Chrysler Dodge Jeep Ram of Taylor, and Ken Garff Automotive, LLC, is a parent company.

I. BACKGROUND

Plaintiff was hired by the dealership in February 2019 as a used-car finance manager. In January 2020, the dealership hired a new general manager, Allan Hall, who reported to regional vice-president Eddie Cawley. Plaintiff was now a new-car finance manager, and he reported to general sales manager Joseph Tillman, and Tillman reported to Hall. The COVID-19 pandemic caused the dealership to shut down in the spring of 2020. Around this time, Hall asked plaintiff to work on a backlog of contracts known as contracts-in-transit (CIT or contracts), which are contracts that had not yet resulted in lender funding to the dealership relative to the sale or leasing of vehicles. Another finance manager from an affiliated dealership located in Southfield assisted plaintiff with processing the contracts. Plaintiff essentially asserted that the Southfield manager forged customer signatures on contracts to which corrections had been made. Plaintiff claimed that the Southfield manager completed or processed CIT in a short period of time by signing the contracts herself instead of having the customers come in and execute the CIT as required by law. Plaintiff reported the alleged activity to Hall and Cawley. The claims were investigated internally and, according to deposition testimony by Cawley, corrective action was taken against the Southfield manager.[2]

In his deposition, plaintiff testified that after he had made the complaint about the Southfield finance manager, Cawley sent him "a scolding reprimand-style e-mail asking why I would try and bring something like this to light, what my intention was, what my end goal was." Plaintiff complained that he was treated as if he had done something wrong when he was simply honoring his obligation to verify that CIT were actually signed by the customers.

On a different matter, the vehicles sold or leased at the dealership were each equipped with a global positioning system (GPS), and plaintiff claimed that during the pandemic shutdown he discovered that the dealership did not have a process in place regarding the transfer of GPS-related software to customers that allegedly resulted in the dealership's having access to a customer's GPS data. Plaintiff, who was not aware of anyone actually accessing the data, advised Hall and Tillman of the GPS issue. Although plaintiff could not recall whether he did so on his own or in conjunction with directives from Hall or Tillman, plaintiff worked on correcting the problem through transference of GPS products from the dealership to customers.

In a July 8, 2020 e-mail from Cawley to plaintiff and two other dealership employees, copied to Tillman and Hall, Cawley stated that "we have some work to do now having $1.6 million in CIT over 15 days old." Cawley offered a cash bonus if the numbers could be improved to "under $800,000 by the morning of the 17th for the amount of CIT over 15 days old[.]" In a July 21, 2020 e-mail from Hall to the same individuals, including plaintiff, Hall wrote: "Good job on the CIT[]. As of the morning of the 17th we were at $1,072,066.63 and as of today we were at $825,297.90 for contracts over 15 days. While still super high, it is an improvement. So while you did not earn any extra payola, you did put in a valiant effort." Hall offered cash bonuses if the CIT

---

[2] In his deposition, when asked what corrective action was taken, Cawley testified: "Up to -- it was part of a -- a future termination." We are not quite sure what Cawley meant by this statement.

-2-

were reduced to under $500,000 within 15 days. Around this time, plaintiff voiced frustration with his work environment, the failure to offer him an open finance director position, the CIT, his pay, and Hall, and he threatened to quit. Plaintiff testified that the dealership did not want him to leave, and plaintiff's pay plan was renegotiated, effective August 1, 2020, which motivated him to stay.

With respect to the finance director position, Tillman sent an e-mail to plaintiff on July 24, 2020, stating:

> Thank you for sitting down with us on Tuesday and discussing your frustrations. Like we discussed in our meeting we are not intentionally stringing you along with the open Finance Director's position with our store, the position is open to anyone who meets the expectations of the Director role, by that I don't mean someone fulfilling the role without the title and pay but someone who leads by example and steps up as a team player. I recognize these leadership abilities in you and I also think you are capable of meeting these expectations so Al [Hall] and I agreed to do a 100 day performance review with you. For the next 100 days we need to see your performance meet all of our normal finance manager expectations including being on time, all of your transactions being recorded, keeping your CIT less than 11 days . . . . On 11/1/2020 Al and I will sit down with you and review your 100 days performance and discuss your qualifications for the Director position. . . . .

On September 22, 2020, plaintiff leased a $70,000 vehicle from the dealership. Plaintiff testified that he took delivery of the vehicle and drove it home that very same day. One of the issues that developed between the dealership and plaintiff concerned the leased vehicle's residual value. In his deposition, plaintiff testified:

> *Q.* Okay. All right. Did you intentionally make the residual value 65 percent instead of 64 percent.
>
> *A.* I don't remember what the exact values were, but the agreement with the lender was that the lender would cover 1 percent of the residual value. So if the residual value was off by 1 percent, the lender . . . over-funded [it].
>
> *Q.* Okay. And why did that happen?
>
> *A.* Because we had a strong relationship with the lender and they have ability to occasionally override residuals.
>
> *Q.* Okay. All right. And did Joe Tillman or Al Hall take issue with that?
>
> *A.* No. They wouldn't have signed the paperwork if they did.
>
> *Q.* Okay. Did anybody at [the dealership] inform you that they thought it was inappropriate for you to have a different residual value than other customers?

*A.* No.

Another issue regarding the leased vehicle concerned the insurance on the car. Plaintiff had an existing no-fault policy with USAA that covered a different vehicle. It was plaintiff's position that his USAA policy automatically insured the newly-leased vehicle for up to 30 days during a grace period in which he could formally add the new car to the USAA policy or purchase a new insurance policy. As reflected in an e-mail by plaintiff, he also claimed that "state law dictates that insurance policies must cover a newly acquired vehicle for 14 days after acquisition[,]" and that the "dealer has 15 days to process an RD[-]108[,]" giving a customer with existing no-fault coverage "2 weeks to shop for a new policy on a newly acquired vehicle." Plaintiff testified that he formally added no-fault insurance on the leased vehicle through USAA on September 24, 2020, although he claimed that he was covered by the existing policy by operation of law and contract as soon as he took delivery on September 22, 2020. There is an e-mail in the record from Hall indicating that he received a call from USAA, as requested by plaintiff, and that USAA provided "a proof of insurance on the vehicle effective on his original delivery date of 9/25/2020."[3] In a September 24, 2020 e-mail from Hall to plaintiff, Hall warned plaintiff as follows:

> Per our conversation today. On your car lease I want a new RD-108 as well as contract and mileage statement reprinted with the actual miles that were on the car on the 22nd. As stated we will not tolerate any misrepresentations in any deal or any employee deal. Also as I said, I do not want that car driven off this lot without a valid proof of insurance in your name, not post dated for next week. I would hope you understand that you should never deliver any vehicle without valid insurance on the new vehicle purchase. Regardless of what you say the rule is with the State of MI. My rule is no valid proof in purchaser/Leese [sic] name, equals no delivery.
> . . . .

Plaintiff testified that he refused to return the leased vehicle to the dealership as demanded by Hall. In his deposition, plaintiff conceded that the dealership had the right to enforce stricter rules regarding insurance on newly sold or leased vehicles. There are a series of alleged text messages between plaintiff and Tillman that were exchanged on September 25, 2020. Crucially, these texts were not submitted to the trial court until plaintiff filed his motion for reconsideration after the court had granted the dealership's motion for summary disposition. Plaintiff texted:

> Its harassment at this point and illegal on top of that. I am not coming in on my day off to park a car that I legally own and have properly insured just because he [Hall] says so. I am in compliance with state laws and the dealer guidebook. Any action against me as an employee is further harassment and retaliation as well.

Tillman responded:

---

[3] The record overwhelmingly indicates that the leased vehicle was actually delivered on September 22, 2020.

This is not harassment and is not undo or unfair. This is my decision as it is my responsibility to protect the dealership and its assets. Steve you were provided exact details in terms of taking the vehicle off of the lot in the email sent by Al [Hall] on my behalf. You are currently in violation of the directive set forth in that email as well as my directive of not taking the vehicle off the lot without insurance. We are simply holding you to the same accountability as we ask any customer buying this type of unit. Please provide proof of insurance on that car effective today in your name or return the car until you can provide valid insurance on that vehicle. The reason for this protocol is the high theft of this type of unit.

Plaintiff then concluded the text message exchange, stating:

I stayed late last night making sure everything was clean on my end and I wouldn't have to deal with any bullshit today and you still managed to ruin my day off with this. I dont think you actually understand how heated I am about this. Call it whatever you want, but being targeted and harassed over a car purchase as an employee is absolutely insane. And then making up new rules regardless of what the laws are and trying to force those down my throat and play take away with something that I legally own and you have no say in is so far across the line, *you really have no idea how badly I still want to get a lawyer involved at this point. If I didn't work there I'd have already been to the police and called the state about it*. [Emphasis added.]

In a September 25, 2020 e-mail by Cawley to various dealership personnel, but not plaintiff, Cawley observed that plaintiff had violated a "directive and took the vehicle home unauthorized and without a current active policy on this car which is an extremely high risk vehicle." Cawley noted in the e-mail that plaintiff was accusing the dealership of harassment but that "we are just trying to protect both him and our dealership against huge financial risk and Murphy's law."

On September 29, 2020, plaintiff obtained a new no-fault insurance policy from AAA covering the leased vehicle. In a September 30, 2020 e-mail from Cawley to dealership personnel, but not including plaintiff, Cawley stated that plaintiff had violated a directive from general manager Hall and had "also engaged in deceptive practices with the lending institution." Cawley further instructed, "I do not want any action taken until we have been funded on his lease contract. Once we are funded, we should Strongly consider our future with [plaintiff]."

In an October 2, 2020 e-mail from Hall to Cawley and Tillman, responding to an earlier e-mail from Cawley asking Hall if there was any lease manipulation by plaintiff that resulted in improper treatment of the lender, Hall stated that plaintiff had manipulated the lender. According to Hall, the manipulation scammed the lender out of $795.45, which broke down to about $22 a month.

On October 6, 2020, the dealership terminated plaintiff's employment. The termination form indicated that plaintiff was fired because he disobeyed a direct order from general manager Hall, his CIT were way above corporate guidelines, and because there was a lack of trust. Boxes on the form were checked for unsatisfactory conduct and failure to meet performance expectations.

On October 8, 2020, plaintiff filed a complaint with the Michigan Secretary of State, and it was later redirected and eventually handled by the Michigan Department of State (MDOS). Plaintiff alleged various improper or illegal actions by the dealership with respect to the purported forged signatures on CIT, the processing of GPS-tracking software, and an assertion by plaintiff that the dealership was charging customers for products that were not received or installed. Plaintiff testified in his deposition that he was about to report the GPS-tracking issue to the state *before* he was terminated. More specifically, plaintiff testified as follows:

> *Q.* You testified that you were about to report the issue as it pertained [to] the GPS tracking before you were terminated?
>
> *A.* Yes, I had – I had the paperwork prepared. That's why I was able to file it so quickly thereafter.
>
> *Q.* And in fact, it was filed only two days after you were terminated?
>
> *A.* Right.

Plaintiff, however, acknowledged in his deposition that he did not tell anyone at the dealership that he was going to file a report or complaint with the state. Plaintiff testified:

> *Q.* Okay. Why is it that you decided to report this to the State of Michigan on October 8th and after the termination of your employment?
>
> *A.* It was something that I tried to address from inside the company to handle the legal aspect of it, and when I wasn't able to succeed with that, I went to the state?
>
> *Q.* All right. So you said you "tried to address it within the company." Did you ever tell anybody within the company that you were going to go to the state?
>
> *A.* *I did not.* [Emphasis added.]

The MDOS investigated plaintiff's claims, and sometime in early 2021, it issued the following findings:

> An MDOS case was opened after receiving information from a former employee of the dealer with allegations that the dealer is signing documents for customers, illegal GPS tracking and charging for products that customers do not receive . . . . The complainant submitted a list of over 800 vehicles that were reportedly purchased by customers where the dealer allegedly still had access to the GPS. The complainant did not have allegations of a specific vehicle or item of his own that he purchased and was submitting the complaint to make the MDOS aware of the alleged activities. The RMD Director requested and specified three files to be reviewed from the list submitted by the complainant. . . . A field investigation was conducted where the General Manager, Al Hall, was interviewed. Mr. Hall

-6-

provided the requested files for a records inspection. Mr. Hall disputed the allegations of 1) dealer accessing the GPS after a customer purchases a vehicle, 2) signing documents for the customer or falsifying a customer's signature, and 3) charging customers for add-ons that are not installed. Mr. Hall stated that all of their inventory does have a GPS installed on the vehicle, but the service is transferred to the customer once the vehicle is purchased and the dealer can no longer track it. Mr. Hall stated customers have the option of purchasing or declining the GPS service called Theft Patrol and provided records of the option where the customer accepts or declines. Mr. Hall was informed to ensure that GPS tracking cannot be accessed by the dealer once a customer purchases a vehicle. Mr. Hall sent the dealer staff an email with procedures to ensure the dealer cannot access the GPS after purchase. The allegations of the dealer signing documents for the customer or falsifying a customer's signature were not substantiated and Mr. Hall disputed this claim. No evidence of varying signatures in the files were observed. The allegation of the dealer charging customers for add-ons that were not installed was not substantiated and Mr. Hall disputed this claim. . . . .

The MDOS did find two technical violations in which there was a failure by the dealership to properly complete form RD-108 in relation to the sale or lease of two vehicles.

On January 5, 2021, plaintiff filed a complaint against the dealership, and he later filed an amended complaint on March 3, 2021. In the amended complaint, plaintiff alleged claims of wrongful discharge in violation of public policy, wrongful termination under the WPA, a hostile work environment under the Elliott-Larsen Civil Rights Act (CRA), MCL 37.2101 *et seq*., retaliatory discharge under the CRA, and intentional infliction of emotional distress (IIED). Much of the lower court proceedings revolved around the dealership's attempt to obtain answers to a first set of interrogatories and to obtain documents in response to a first request for production of documents. On June 24, 2021, a stipulated order compelling discovery was entered, requiring plaintiff to answer the interrogatories and to produce the requested documents. On September 8, 2021, the dealership moved to dismiss plaintiff's action on the basis that he had failed to fully and completely answer the first set of interrogatories and failed to fully and completely comply with the first request to produce documents. By order dated September 20, 2021, the trial court did not dismiss plaintiff's action, but it did compel plaintiff to answer certain interrogatories and to produce certain documents. Pertinent here, plaintiff gave the following reply to a document production request:

Upon a diligent search[,] Plaintiff does not have in his possession notes, writings, memoranda, emails, correspondence, tape recordings, videotapes, calendars, documentary evidence, or other recordings, documenting, memorializing, reflecting or concerning any conversations or communications of any type between Plaintiff and/or his agents and any present or former member, officer, director, employee or agent of [the dealership], concerning the events complained of in the Complaint including all such materials communicated, stored or maintained in the form of electronic media.

Plaintiff took a general position during discovery that he had lost access to substantial information and documents when he was terminated.

On January 19, 2022, the dealership moved for summary disposition. With respect to the WPA claim, the dealership argued that the claim was untimely because it was not filed within 90 days after the alleged violation, that there was no causal connection between the protected activity and the termination, especially considering that plaintiff told no one that he was going to lodge a complaint with the state, and that plaintiff could not establish pretext in the face of the dealership's valid reasons for the firing. The dealership additionally contended that it was entitled to summary disposition with regard to the remaining claims. Plaintiff responded to the motion challenging each of the dealership's arguments regarding the WPA claim. Plaintiff conceded that the claim of wrongful discharge failed because the WPA is the exclusive remedy when considered in conjunction with any common-law claim of wrongful discharge. And although plaintiff presented arguments in support of his CRA claims, he agreed to their dismissal at the summary disposition hearing because he was not a member of a protected class. As to the IIED claim, plaintiff asserted that it was a viable claim; however, the court later determined as a matter of law that there was no behavior that could be characterized as outrageous, which ruling plaintiff does not challenge on appeal. With regard to the parties' specific arguments associated with the WPA claim, we shall discuss them in the analysis section of this opinion to avoid redundancy, but only to the extent that they are relevant to the resolution of this appeal.

At the hearing on the motion for summary disposition held on February 9, 2022, the trial court entertained the parties' arguments, dismissed the non-WPA claims, and then summarily dismissed plaintiff's WPA claim, reasoning as follows:

> [I] could see that an employer might reach the conclusion on its own based on a plaintiff's or an employee's constant complaining about illegal activity that the employee planned to make a complaint to the authorities about the illegal activity. But, that as [defense counsel] points out is not the standard under the [WPA].
>
> In order for the plaintiff to proceed on that [claim] there has to be some evidence that would be sufficient to prove by clear and convincing standard that the employer knew that he was about to make a report and terminated him before that report could be made. And, there's nothing on this record that – that suggests that the employer knew or suspected that the plaintiff was going to make a report to any authorities and the – the plaintiff disavowed having told anybody that he was going to make a complaint.
>
> On those facts even giving the benefit of all reasonable doubt to the non-moving party, the plaintiff, I don't see that plaintiff has stated a claim upon which relief can be granted and has not supported it with the factual developments to defeat MCR 2.116(C)(10) so I will grant summary disposition on [the WPA claim] as well which . . . brings us to summary disposition on all counts.

On February 25, 2022, the trial court entered an order granting the dealership's motion for summary disposition for the reasons stated on the record. On February 28, 2022, plaintiff moved for reconsideration, arguing that he had in fact told the dealership on September 25, 2021, which was 11 days before the termination, that he was going to inform the state of the dealership's

unethical behavior. Plaintiff attached—for the first time—the text messages between plaintiff and Tillman from September 25, 2020, which, again, included in part this statement by plaintiff:

> [Y]ou really have no idea how badly I still want to get a lawyer involved at this point. If I didn't work there I'd have already been to the police and called the state about it.

In a cursory order, the trial court denied the motion for reconsideration, concluding that plaintiff was presenting the same arguments already ruled on by the court. The record does not reveal whether the trial court took into consideration the text messages.

## II. ANALYSIS

### A. ARGUMENTS ON APPEAL

On appeal, plaintiff states that his "cause of action rested on whether he informed his employer before his termination that he was going to report their questionable behavior to the State thus allowing him to avail himself of the [WPA] lawsuit." Plaintiff argues that a mere 11 days before the termination, he unambiguously informed the dealership—specifically Tillman—that he was going to go to the state and the police and get the lawyers involved. Plaintiff also vaguely contends that "[u]pon belief, [he] discussed the contents of the report filed with Mr. Hall prior to [p]laintiff['s] termination."[4] Plaintiff maintains that a causal connection existed between the protected activity, i.e., being about to report a violation or suspected violation of law, and his termination. Plaintiff further argues that the proffered reasons for the dealership's decision to terminate him were not worthy of any credence.

The dealership argues that the trial court did not abuse its discretion by denying plaintiff's motion for reconsideration given that plaintiff presented alleged communications in the form of text messages for the first time on reconsideration. The dealership contends that we should disregard the alleged text messages attached to plaintiff's brief on appeal due to his failure to produce them before the trial court decided the motion for summary disposition. The dealership also maintains that the trial court properly dismissed the WPA claim because plaintiff cannot establish that any alleged protected activity was causally connected to his termination. The dealership further asserts that plaintiff did not engage in any protected activity before the termination, that the dealership was not affected by plaintiff's post-termination report, that plaintiff was not about to report a suspected violation of law, and that the alleged text messages between plaintiff and Tillman did not show that plaintiff was about to file a report or complaint. The dealership next argues that the WPA claim fails because plaintiff cannot establish pretext. The dealership additionally posits that the WPA claim was properly dismissed against Ken Garff Automotive, LLC, and Telegraph Chrysler Dodge Jeep Ram of Taylor because neither were plaintiff's employer. Finally, and there is no dispute on this matter, the dealership contends that plaintiff abandoned all the other claims.

---

[4] We note that there is no documentary evidence supporting this assertion. Hall passed away on April 29, 2021, which was after plaintiff filed the lawsuit.

-9-

## B. STANDARD OF REVIEW AND PRINCIPLES REGARDING MOTIONS FOR SUMMARY DISPOSITION AND RECONSIDERATION

This Court reviews de novo a trial court's ruling on a motion for summary disposition. *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 159; 934 NW2d 665 (2019). We also review de novo questions with respect to the interpretation and application of a statute. *Estes v Titus*, 481 Mich 573, 578-579; 751 NW2d 493 (2008).[5] This Court reviews "a trial court's decision on a motion for reconsideration for an abuse of discretion." *Frankenmuth Ins Co v Poll*, 311 Mich App 442, 445; 875 NW2d 250 (2015). "[A]n abuse of discretion occurs only when the trial court's decision is outside the range of reasonable and principled outcomes." *Saffian v Simmons*, 477 Mich 8, 12; 727 NW2d 132 (2007).

In *Anderson v Transdev Servs, Inc*, 341 Mich App 501, 506-507; 991 NW2d 230 (2022), this Court set forth the guiding principles in analyzing a motion brought pursuant to MCR 2.116(C)(10):

> MCR 2.116(C)(10) provides that summary disposition is appropriate when, "[e]xcept as to the amount of damages, there is no genuine issue as to any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law." A motion brought pursuant to MCR 2.116(C)(10) tests the factual support for a party's action. "Affidavits, depositions, admissions, or other documentary evidence in support of the grounds asserted in the motion are required . . . when judgment is sought based on subrule (C)(10)," MCR 2.116(G)(3)(b), and such evidence, along with the pleadings, must be considered by the court when ruling on the (C)(10) motion, MCR 2.116(G)(5). "When a motion under subrule (C)(10) is made and supported . . ., an adverse party may not rest upon the mere allegations or denials of his or her pleading, but must, by affidavits or as otherwise provided in this rule, set forth specific facts showing that there is a genuine issue for trial." MCR 2.116(G)(4).

---

[5] In *Slis v Michigan*, 332 Mich App 312, 335-336; 956 NW2d 569 (2020), this Court recited the well-established principles regarding statutory interpretation, stating as follows:

> This Court's role in construing statutory language is to discern and ascertain the intent of the Legislature, which may reasonably be inferred from the words in the statute. We must focus our analysis on the express language of the statute because it offers the most reliable evidence of legislative intent. When statutory language is clear and unambiguous, we must apply the statute as written. A court is not permitted to read anything into an unambiguous statute that is not within the manifest intent of the Legislature. Furthermore, this Court may not rewrite the plain statutory language or substitute its own policy decisions for those decisions already made by the Legislature. [Citations omitted.]

A trial court may grant a motion for summary disposition under MCR 2.116(C)(10) if the pleadings, affidavits, and other documentary evidence, when viewed in a light most favorable to the nonmovant, show that there is no genuine issue with respect to any material fact. A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ. The trial court is not permitted to assess credibility, weigh the evidence, or resolve factual disputes, and if material evidence conflicts, it is not appropriate to grant a motion for summary disposition under MCR 2.116(C)(10). Like the trial court's inquiry, when an appellate court reviews a motion for summary disposition, it makes all legitimate inferences in favor of the nonmoving party. Speculation is insufficient to create an issue of fact. A court may only consider substantively admissible evidence actually proffered by the parties when ruling on the motion. [Quotation marks, citations, and brackets omitted.]

"Generally, and without restricting the discretion of the court, a motion for rehearing or reconsideration which merely presents the same issues ruled on by the court, either expressly or by reasonable implication, will not be granted." MCR 2.119(F)(3). The party seeking reconsideration "must demonstrate a palpable error by which the court and the parties have been misled and show that a different disposition of the motion must result from correction of the error." *Id.* There is no abuse of discretion when a court denies a motion for reconsideration that rests on evidence that could have been presented the first time the pertinent issue was raised. *Churchman v Rickerson*, 240 Mich App 223, 233; 611 NW2d 333 (2000). "As a general rule, an issue is not preserved if it is raised for the first time in a motion for reconsideration in the trial court." *George v Allstate Ins Co*, 329 Mich App 448, 454; 942 NW2d 628 (2019).

## C. WPA FRAMEWORK

MCL 15.362 provides:

An employer shall not *discharge*, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee, or a person acting on behalf of the employee, reports or *is about to report*, verbally or in writing, *a violation or a suspected violation* of a law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States to a public body, unless the employee knows that the report is false, or because an employee is requested by a public body to participate in an investigation, hearing, or inquiry held by that public body, or a court action. [Emphasis added.]

In this case, plaintiff's WPA theory was that he was terminated by the dealership because he was *about to report* the dealership's actions concerning the GPS-tracking software and the alleged forged CIT. With respect to an about-to-report WPA claim, MCL 15.363(4) provides that "[a]n employee shall show by *clear and convincing* evidence that he or she or a person acting on his or her behalf *was about to report*, verbally or in writing, a violation or a suspected violation of a law of this state, a political subdivision of this state, or the United States to a public body." (Emphasis added.)

-11-

In *Wurtz v Beecher Metro Dist*, 495 Mich 242, 251-252; 848 NW2d 121 (2014), our Supreme Court explained:

Drawing from the statutory language, this Court has identified three elements that a plaintiff must demonstrate to make out a prima facie case that the defendant employer has violated the WPA:

(1) The employee was engaged in one of the protected activities listed in the provision.

(2) [T]he employee was discharged, threatened, or otherwise discriminated against regarding his or her compensation, terms, conditions, location, or privileges of employment.

(3) A causal connection exists between the employee's protected activity and the employer's act of discharging, threatening, or otherwise discriminating against the employee. [Citations omitted.]

"Absent direct evidence of retaliation, a plaintiff must rely on indirect evidence of his or her employer's unlawful motivations to show that a causal link exists between the whistleblowing act and the employer's adverse employment action." *Debano-Griffin v Lake Co*, 493 Mich 167, 176; 828 NW2d 634 (2013) (applying the burden-shifting framework of *McDonnell Douglas Corp v Green*, 411 US 792; 93 S Ct 1817; 36 L Ed 2d 668 [1973]). A plaintiff may present a rebuttable prima facie case on the basis of proofs from which a finder of fact could reasonably infer that the plaintiff was the victim of unlawful retaliation for purposes of the WPA. *Debano-Griffin*, 493 Mich at 176. If a plaintiff establishes a prima facie case, a presumption of retaliation arises. *Id.*

"The employer, however, may be entitled to summary disposition if it offers a legitimate reason for its action and the plaintiff fails to show that a reasonable fact-finder could still conclude that the plaintiff's protected activity was a 'motivating factor' for the employer's adverse action." *Id.* Merely raising a triable issue that the employer's proffered reason was pretextual does not suffice; rather, it must be shown that it was a pretext for unlawful retaliation. *Id.*

With respect to the "causal connection" element of a prima facie WPA case, a temporal relationship, in and of itself, does not demonstrate a causal connection between the protected activity at issue and the adverse employment action. *Id.* at 177. Something more than a temporal connection is required to show causation when retaliation is claimed. *Id.* In *Kaufman & Payton, PC v Nikkila*, 200 Mich App 250, 257-258; 503 NW2d 728 (1993), this Court observed:

An employer's subjective fear . . . will not substitute for some form of notice of threatened action. Instead, an employer is entitled to objective notice of a report or a threat to report by the whistleblower. Neither Kaufman's nor the firm's knowledge that Nikkila had retained counsel, together with other unspecified evidence, yields an inference that the firm believed before she resigned [constructive discharge] that she would report her complaints to responsible agencies.

And in *Chandler v Schlumberger*, 214 Mich App 111, 117; 542 NW2d 310 (1995), aff'd 456 Mich 395 (1998), this Court, referring to *Kaufman & Payton*, stated:

> [T]he problem with the counterplaintiff's case in *Kaufman & Payton* was the lack of a causal connection between the alleged constructive discharge and protected activity under the WPA due to the employer's apparent lack of belief or knowledge of any protected activity. In other words, if the employer did not believe or know of the employee's protected activity, it would be difficult to imagine how that could have been the basis for discharge.[6]

## D.  DISCUSSION AND RESOLUTION

We hold that plaintiff failed as a matter of law to establish a prima facie case under the WPA because there was no evidence showing a causal connection between plaintiff's conduct in preparing to report a violation or suspected violation of law and his termination.

Examining this case at the point of summary disposition, we find that there was no evidence that plaintiff told anyone connected to the dealership that he was about to lodge a report with the state before the termination.  Indeed, plaintiff testified that he "did not" ever tell anybody within the dealership that he was going to go to the state with his grievances.  And as part of discovery, plaintiff indicated that after a diligent search, he did not have in his possession any type of documentary evidence concerning the events that led him to file the lawsuit against the dealership. Plaintiff asserts "upon information and belief" that he discussed the report made to the state with Hall before plaintiff was fired, but he cannot verify this "belief" because of Hall's untimely death. There is no documentary evidence supporting this claim, and plaintiff's own testimony wholly contradicts the assertion.  Moreover, plaintiff attached his own affidavit to the response to the dealership's motion for summary disposition, but there were no averments asserting that he had communicated to anyone before the termination that he was about to report a violation or suspected violation of law.  There was no contention that plaintiff had spoken to Hall about submitting a complaint to the state before or after plaintiff was fired.  We note that even had plaintiff made such an averment in his affidavit, it likely could not have overcome his concession in his deposition that he told no one.  See *Dykes v Wm Beaumont Hosp*, 246 Mich App 471, 480; 633 NW2d 440 (2001) (parties cannot contrive factual issues by simply asserting the contrary in an affidavit after having given damaging deposition testimony).

---

[6] We also note this Court's ruling in *Roberson v Occupational Health Ctrs of America, Inc*, 220 Mich App 322, 326; 559 NW2d 86 (1997), wherein the panel found:

> An employer is entitled to objective notice of a report or a threat to report by the whistleblower. Plaintiff argues that she provided evidence that she had told a manager that she was about to report the conditions of the building to the Occupational Health and Safety Administration . . . and was terminated as a result. We find that plaintiff failed to provide evidence to demonstrate a question of fact regarding this issue. [Quotation marks, citations, and brackets omitted.]

Plaintiff did present the September 25, 2020 text messages between him and Tillman when plaintiff filed his motion for reconsideration. To the extent that the trial court decided not to consider the text messages, which may or may not have been the case, it would not constitute an abuse of discretion because plaintiff had not submitted them earlier despite having the opportunity to do so. See *Churchman*, 240 Mich App at 233. Additionally, the issue regarding whether the text messages created an issue of fact on the element of causation was not properly preserved because it was not raised until the motion for reconsideration was filed. See *George*, 329 Mich App at 454. Thus, for purposes of preservation requirements in civil litigation, the issue was waived. See *Tolas Oil & Gas Exploration Co v Bach Servs & Mfg, LLC*, ___ Mich App ___, ___; ___ NW2d ___ (2023) (Docket No. 359090); slip op at 3.

Nevertheless, even if we consider the text messages, they do not create a genuine issue of material fact on the issue whether a causal connection existed between plaintiff's protected activity and his termination. Again, the pertinent portion of plaintiff's text messages provided:

> [Y]ou really have no idea how badly I still want to get a lawyer involved at this point. If I didn't work there I'd have already been to the police and called the state about it.

This language simply does not indicate or suggest that plaintiff was about to report an illegal action to the police, state, or a lawyer. Indeed, the message reflects a mindset by plaintiff that he was not prepared to lodge a report or complaint with anyone about the dealership so long as he remained employed at the dealership. Furthermore, when this particular text language is considered in context with the overall text conversation between plaintiff and Tillman, plaintiff's frustration and his comments about contacting an attorney, the police, and the state were he not an employee were clearly related to the debate about insurance on the newly-leased car, not the CIT and GPS matters, which were the topics in the report to the state. Plaintiff's WPA theory was not that he was discharged because he was about to report a violation or suspected violation of law connected to the no-fault insurance dispute, assuming that the subject even concerned a legal violation. We also question whether the GPS-related matter had any connection whatsoever to a violation of a law, regulation, or rule. And the fact that the text messages were exchanged just 11 days before plaintiff was fired cannot in and of itself demonstrate the requisite causal connection. See *Debano-Griffin*, 493 Mich at 177.

As this Court has observed, if an employer did not know of an employee's protected activity, it would be difficult to imagine how that engagement in protected activity could have been the basis for a termination. *Chandler*, 214 Mich App at 117. In sum, we hold that the trial court did not err by granting the dealership's motion for summary disposition, nor did the court abuse its discretion by denying plaintiff's motion for reconsideration. There simply is insufficient evidence on the causal-connection element relative to establishing a prima facie case under the WPA, making it unnecessary for us to explore issues regarding the validity of the grounds for termination and pretext.

We affirm. Having fully prevailed on appeal, the dealership may tax costs under MCR 7.219.

/s/ Colleen A. O'Brien
/s/ Mark J. Cavanagh
/s/ Jane E. Markey